## Case No. 16,377.

UNITED STATES v. STANWOOD.

[See Case No. 15,130.]

---

## Case No. 16,378.

UNITED STATES v. STARK et al.

[15 Int. Rev. Rec. 48; 11 Am. Law Reg. (N. S.) 37; 6 Am. Law Rev. 573.]

District Court, D. Georgia. Nov. 27, 1871.

CUSTOMS DUTIES — IMPORTATIONS AT PORTS CONTROLLED BY INSURGENTS—LIABILITY TO DUTIES.

[1. Neither the fact that a port of the United States is under the control of an insurgent body, such as the so-called Confederate States, nor the fact that the government of the United States had conceded belligerent rights to the insurgents, will operate to suspend the revenue laws so as to relieve goods there imported from the payment of duties to the United States. Distinguishing U. S. v. Hayward, Case No. 15,336, and U. S. v. Rice, 4 Wheat. (17 U. S.) 247.]

[2. Nor was any such effect produced by the president's proclamation of April 19, 1861 (12 Stat. 1258), declaring a blockade of certain ports in the rebellious states; and any cargoes which managed to evade the blockade were still subject to the duties prescribed by law.]

This action was brought to recover of defendants [William H. Stark and others] the sum of $959.04, the duties on two hundred and sixty-six hogsheads and forty-one barrels of molasses, valued at $3,996, imported by the defendants into the port of Savannah on the 7th day of May, 1861. The defendants pleaded the general issue, and payment of the duties. The case was submitted to the jury on the following agreed facts: The goods were imported into the port of Savannah by the defendants at the time named in the declaration, and the amount of duties was as stated in the declaration, and they had never been paid to the United States. John Boston, United States collector of customs at the port of Savannah, resigned his said office on the 31st day of January, 1861, and he was collector of customs for the Confederate States at the port of Savannah at the time of the importation of the goods mentioned in the declaration. At that time the port of Savannah was in the paramount forcible military possession of the Confederate authorities, and by such paramount military authority the United States government, both civil and military, was excluded. The duties on said goods were paid to the collector of customs of the Confederate government.

John D. Pope, U. S. Dist. Atty.
Law, Lovell & Falligant, for defendants.

Before WOODS, Circuit Judge, and ERSKINE, District Judge.

WOODS, Circuit Judge (charging jury). The facts in this case are all agreed upon, so that there is nothing for you to do but to return a verdict as instructed by the court. By the act of congress of July 30, 1846 (9 Stat. 42), § 1, it is provided that there shall be levied, collected, and paid on goods, wares, and merchandise imported into the United States from a foreign country, the duties prescribed by the act. The United States is therefore entitled to recover in this action, unless the defendants present some valid reason why they should be relieved from the payment of the duties on the goods imported by them.

Defendants insist that the agreed facts and public history, of which the court takes judicial notice, shows of such a state of affairs, that at the time of the importation they were under no obligation to pay duties to the United States. They say that the Confederate States, being a belligerent power at war with the United States, and holding by military force territory captured from the United States, acquired a sovereignty

over such territory and during such occupancy. Allegiance within such territory was due to the Confederate States, and they only were entitled to receive duties on imports, and that in effect the port of Savannah was not a port of the United States but was a port of the Confederate States. In support of this view the cases of U. S. v. Hayward [Case No. 15,336], and U. S. v. Rice, 4 Wheat. [17 U. S.] 247, are cited. Both these cases were actions for the recovery of duties on goods imported into Castine, during the war of 1812, with Great Britain, and after that place had been captured by and surrendered to the British forces. The circuit court of the United States in the first case, and the supreme court of the United States in the other held that the goods imported were not liable to pay duties to the United States. The ground upon which these decisions were based is stated by the court in the case of U. S. v. Hayward in these words: "By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy. The sovereignty of the United States over the territory was of course suspended, and the laws of the United States could no longer be rightfully enforced or be obligatory upon the inhabitants who remained and submitted to the conquerors. Castine, therefore, could not strictly be deemed a port of the United States, for its sovereignty no longer extended over the place." So in U. S. v. Rice [supra], the supreme court of the United States says: "Under the circumstances we are all of opinion that the claim for duties cannot be sustained. By the conquest and military occupation, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over that place. The sovereignty of the United States over the territory was of course suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender, the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only as it chose to recognize and impose. From the nature of the case no other laws could be obligatory upon them, for where there is no protection or allegiance or sovereignty, there can be no claim to obedience. Castine was, therefore, during this period so far as respected our revenue laws to be deemed a foreign port." It is clear from the extract just quoted that the decision in those cases was placed on the ground that Great Britain had acquired the sovereignty of Castine, and that the inhabitants owed the British government allegiance. If the Confederate States was a sovereignty, and was entitled as against the United States to the allegiance of the people living within the territory held by them, then these cases are directly in point as supporting the defendant's views. But the Confederate States as a sovereign power never had an existence. It was never recognized as such by any department of the government of the United States, or by any other nation on the globe. There was never a moment when any human being owed it allegiance; on the contrary, allegiance was due the United States and to their laws from all the inhabitants of the territory held by the military power of the Confederate States, and any violation of the laws of the United States was punishable by the authority of the United States. The government of the United States might prosecute for violation of its laws during the Rebellion. It has assumed to pardon those guilty of offences against its statutes, and a large number of prominent citizens of the late insurgent states now hold the pardon of the president for offences against the laws of the country, committed during the Rebellion, within the territory held by the military power of the Confederate States. Can we say then that a rebellion which never had a government which was recognized as such, was a sovereign, that it acquired sovereignty over territory held by force of its arms, and that the people of the territory controlled by it owed allegiance to a government which never had an existence? Clearly not.

That these views are the views of the supreme court of the United States will appear from the adjudicated cases. In Hickman v. Jones, 9 Wall. [76 U. S.] 200, Mr. Justice Swayne, speaking for the court, says: "The rebellion out of which the war grew was without any legal sanction. In the eye of the law it had the same properties as if it had been the insurrection of a county or smaller municipal territory against the state to which it belonged. The proportions and duration of the struggle did not affect its character, nor was there a rebel government de facto in such a sense as to give any legal efficacy to its acts. It was not recognized by the national or any foreign government. It did not for a moment displace the rightful government. That government was always in existence in the regular discharge of its functions, and constantly exercising all its military power to put down the resistance to its authority in the insurrectionary states. The union of the states for all the purposes of the constitution is as perfect and indissoluble as the union of the integral parts of the states themselves." Again, in the case of U. S. v. Keehler, 9 Wall. [76 U. S.] 86, Mr. Justice Miller, as the organ of the court, says: "It certainly cannot be admitted for a moment that a statute of the Confederate States or the order of its postmaster-general could have any legal effect in making the payment to Clements valid. The whole Confederate

power must be regarded as a usurpation of unlawful authority, incapable of passing any valid laws, and certainly incapable of divesting, by an act of its congress or an order of one of its departments, any right of property of the United States." In Shortridge v. Macon [Case No. 12,812], tried by Mr. Chief Justice Chase in the circuit court of the district of North Carolina, he says: "War levied against the United States by citizens of the republic under the pretended authority of the new state government of North Carolina or the new central government which assumed the title of Confederate States, was treason against the United States. * * * On no occasion and by no act have the United States ever renounced their constitutional jurisdiction over the whole territory or over all the citizens of the republic, or conceded to citizens in arms against their country the character of alien enemies, or to their pretended country the character generally of a de facto government. There is nothing in the Prize Cases which gives countenance to the doctrine which counsel endeavors to deduce from it, that the insurgent states, by the act of rebellion, and by levying war against the nation, became foreign states, and their inhabitants alien enemies."

These cases show how broadly the case at bar differs from the case of U. S. v. Hayward, and U. S. v. Rice, relied on by counsel for defendants. Those cases were placed on the ground that the inhabitants of Castine owed allegiance to the sovereignty of Great Britain and obedience to her laws. The Confederate States were not a sovereignty; its inhabitants did not owe it allegiance, were not bound by its laws. On the contrary, the authority of the United States extended over them at all times. Their duty of allegiance and obedience to its laws was continuous and unbroken. All the laws of the United States, the act levying duties on imports included, were in force at all times and in all places within the territory of the United States, as much in Savannah as in New York; and all the citizens of the United States, whether within or without the insurrectionary districts, owed them obedience. If, as held by Mr. Chief Justice Chase, the laws of the United States against treason were in force over the inhabitants of the insurgent states, clearly the revenue laws were also in force.

But it is claimed for defendants that the Confederate States were belligerents, and that belligerent occupation gave them the right to revenues of the port or country occupied. We cannot concur in this view. It is difficult to conceive of a more dangerous and pernicious doctrine. It would place in the hands of insurgents, to whom, out of humane motives belligerent rights had been conceded, those rights which are only accorded to a sovereign power, and hold out the hope of plunder as a motive and incentive to rebellion. The concession of belligerent rights to insurgents does not render them any less insurgents. It clothes them with no attributes of sovereignty, among the highest of which is the right to levy taxes and impost. It gave the insurgents no more right to collect duties than the granting of belligerent rights to the insurgent inhabitants of a county in the state of Georgia would confer upon them the right to enforce the collection of the taxes due the state. This precise point was decided by Mr. Chief Justice Chase in Shortridge v. Macon, already cited. He says: "There is nothing in that opinion (the Prize Cases) which gives countenance to the doctrine that the insurgent states, by the act of rebellion, and by levying war against the nation, became foreign states, and their inhabitants alien enemies. This proposition being denied, it must result that in compelling debtors to pay receivers for the support of the Rebellion debts due to any city of the United States, the insurgent authorities committed illegal violence by which no obligation of debtors to creditors could be conceded or in any way respect affected."

We cannot admit for a moment the claim which appears to be set up by counsel for defendants, that by the concession of belligerent rights to the insurgents the United States agreed to remit the duties on goods imported into the insurgent territory, because such goods were necessary for the support of the insurgents. In other words, the right to import goods free of duty is not a belligerent right. It is also claimed for defendants that a blockade of the ports of the insurgent districts having been declared by the president of the United States in his proclamation of April 19, 1861, the laws for collection of duties were suspended by the law of the blockade. We do not understand that the president has authority to suspend the laws of the United States, nor can we suppose that this was the purpose of the proclamation of the blockade. The preamble recites as one of the reasons for the blockade the fact that by reason of the insurrection the laws of the United States for the collection of the revenue could not be effectually executed in the states named conformably to that provision of the constitution which requires duties to be uniform throughout the United States. One purpose of the blockade was, therefore, to secure the uniform collection of duties. The way not to accomplish this would be to allow all vessels which might succeed in eluding the blockade to discharge their cargoes duty free. If we adopt the view of defendants, one great purpose for which the blockade was established would be defeated. The laws of the United States required all goods imported from a foreign country to pay duties. The president's proclamation closed certain ports. Can it be claimed, with any fair show of reason, that because a vessel

had defied the proclamation and entered a blockaded port, that that fact relieves her cargo from the payment of duties?

Our view, then, of this case is this: The law of congress gives the national government a right to collect duties on all foreign goods imported into any port of the United States. Notwithstanding the Rebellion, the authority and laws of the United States extend over the insurgent territory. The port of Savannah was at all times a port of the United States. The Confederate States was not a sovereignty. The laws of its congress were absolute nullities. They had no right to collect duties, to levy taxes, or in any way to exercise the functions of a government. The people of the insurgent states were not bound to obey their laws, so far as they attempted to interfere with the rights of the United States, but, on the contrary, owed allegiance to the United States and obedience to their laws. And it follows that the United States are entitled to the duties on goods imported into the insurgent districts during the Rebellion. Your duty will therefore be discharged by returning a verdict for the plaintiff for the sum of $959.04 in gold, with interest from the 7th day of May, 1861.